IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| SEALED, | § | FILED UNDER SEAL PURSUANT |
| | § | TO 31 U.S.C. § 3729, et seq. |
|     Plaintiffs, | § | |
| v. | § | No. _____ |
| | § | |
| SEALED, | § | |
| | § | JURY TRIAL DEMANDED |
|     Defendants. | § | |

# <u>FILED UNDER SEAL</u>

## <u>(ATTENTION SEAL CLERK)</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | § | FILED UNDER SEAL PURSUANT |
| STATE OF TEXAS | § | |
| *ex rel*. MELISSA GONZALEZ | § | TO 31 U.S.C. § 3729, et seq., |
| | § | |
| Plaintiff, | § | |
| v. | § | No. _____ |
| | § | |
| TEXAS BEHAVIORAL HEALTH, PLLC | § | |
| and UNITED PSYCHIATRY INSTITUTE, | § | |
| LLC | § | |
| | § | |
| Defendants. | § | |

## RELATOR'S ORIGINAL COMPLAINT

Relator Melissa Gonzalez, on behalf of the United States of America and the State of Texas, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001, *et seq*., files this Complaint against Defendants Texas Behavioral Health, PLLC and United Psychiatry Institute, LLC.  This Complaint is premised on Defendants' scheme to defraud the United States and Texas governments by knowingly submitting claims to Medicare and Medicaid programs for miscoded mental health services. Defendants have defrauded the United States and Texas governments by submitting claims to the Medicare and Medicaid programs which purport that services were provided by physicians, incident-to a physician's services, or by licensed mental health counselors, when such services were provided by unsupervised nurse practitioners and physician's assistants, and an intern.  In support thereof, Relator alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 31 U.S.C. § 3729, *et seq*., and 31 U.S.C. § 3730(b).

2.      This Court also has supplemental jurisdiction over Relator's claims arising under the laws of the State of Texas pursuant to 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

3.      Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §1391(b) and (c) and 31 U.S.C. § 3732(a).

4.      This case is based on the knowledge of Relator Melissa Gonzalez, an "original source" as those terms are defined in 31 U.S.C. § 3730.

5.      This Complaint has been filed under seal and shall remain under seal for at least sixty (60) days and until the Court so orders.

6.      A copy of this Complaint has been served on the United States Attorney General, United States Attorney for the Southern District of Texas, and the Texas Attorney General.

7.      All conditions precedent required by 31 U.S.C. § 3730 have occurred.

## PARTIES

8.      Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled ("Medicare"), established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.

9.      Plaintiff, the State of Texas, administers the state Medicaid program.   The Medicaid program is a joint Federal-State program that pays certain healthcare costs for persons who are qualified to receive covered benefits as a result of their economic situation.   The Federal government reimburses states for a percentage of the payments made by states under their Medicaid programs.

10.     Relator Melissa Gonzalez ("Relator") is a resident of the State of Texas and has twenty-eight (28) years of experience in the healthcare industry. Relator is a former employee of Defendant Texas Behavioral Health PLLC.

11.     Defendant Texas Behavioral Health PLLC ("TBH") is a provider of mental health services in the South Texas area.  TBH's principal place of business is located at 104 Whispering Pines Avenue, Friendswood, Texas 77546.  TBH maintains four (4) satellite offices, which are located in Pearland, Pasadena, and Houston.  TBH may be served with process via its registered agent for service, Zishan Ul-Haq[1], located at 12234 Shadow Creek Parkway, Suite 4104, Pearland Texas, 77584.[2]  State filings identify TBH's managing members as Dr. Salah Qureshi and Dr. Shakeel Raza.

12.     Defendant United Psychiatry Institute, LLC ("United Psychiatry") is a Texas limited liability corporation, formed on January 9, 2013.   United Psychiatry forfeited its existence on or about August 2, 2019.  Its registered agent for service of process is Dr. Shakeel Raza, located at 12234 Shadow Creek Parkway, Suite 4104, Pearland Texas, 77584. State records identify United Psychiatry's managing members as Dr. Shakeel Raza, Dr. Fasiha Haq, and Zeeshan Haq.

## THE FCA AND TMFPA

13.     Generally, the False Claims Act ("FCA") prohibits any person from (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the Government; (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspiring to commit a violation of the False Claims Act; and (4) knowingly making, using, or causing to be made or used, a false

---

[1] Upon information and belief, Zishan Ul-Haq may spell his name as "Zeeshan Haq."
[2] Ul-Haq is the CEO of TBH.  The Pearland satellite office is also located at the 12234 Shadow Creek Parkway address.

record or statement material to an obligation to pay money to the government, or knowingly concealing or improperly avoiding an obligation to pay money to the government.  31 U.S.C. § 3729.

14.     The FCA defines "knowing" and "knowingly" to mean, "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).

15.     The Texas Medicaid Fraud Prevention Act ("TMFPA") prohibits any person from knowingly making, or causing to be made, a false statement or misrepresentation of material fact, which permits that person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.

16.     Additionally, the TMFPA prohibits any person from making a claim under the Medicaid program while knowingly failing to indicate the type of license and the identification number of the licensed health care provider who actually provided the service.

## THE MEDICARE AND MEDICAID PROGRAMS

17.     Congress established the Medicare program as part of the Social Security Amendments of 1965. The Medicare program is a national health insurance plan which covers the cost of medical care for the elderly and disabled. 42 U.S.C. § 1395 *et seq*. The Medicare program provides basic protection against the costs of inpatient hospital and other institutional provider care. It also covers the cost of physician and other healthcare practitioner services.

18.     Medicare Part A covers hospital inpatients' hospitalization costs. Medicare Part B coverage includes, but is not limited to, physician and laboratory services, outpatient care, and many preventative services.   Mental health services, including services provided by a

psychiatrist, clinical psychologist, clinical social worker ("LCSW"), nurse practitioner ("NP"), and physician's assistant ("PA"), are covered under Part B.

19.     Medicaid is a federally assisted grant program for the States.  Medicaid enables the States to provide medical assistance and related services to needy individuals.  The United States provides funds to the State of Texas through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*.  In Texas, the Health and Human Services Commission ("HHSC") is the state agency designated to administer federal Medicaid funds.

20.     In Texas, Medicaid benefits can be managed by HHSC ("Traditional Medicaid") or a managed care organization ("MCO").  With Traditional Medicaid, a provider bills HHSC and is directly reimbursed by the state ("fee-for-service").  With an MCO, the state pays the MCO a lump sum per month, and the MCO reimburses the provider.

21.     Providers must be enrolled in Traditional Medicaid before they can contract with an MCO. *See* Texas Medicaid Provider Procedures Manual, Medicaid Managed Care Handbook § 2.2.1 (2020).

## MEDICARE BILLING FOR MENTAL HEALTH SERVICES

22.     Providers submit claims to Medicare by billing a private carrier, known as a Medicare Administrative Contractor ("MAC"), which reviews, approves and pays Medicare claims to health care providers, such as TBH, on behalf of CMS. Providers who submit claims electronically to CMS or to CMS contractors must certify in their enrollment application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to

that claim is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment.

23.     Medicare Part B benefits include payment for services provided by a psychiatrist (42 C.F.R. 410 § 20(b)), clinical psychologist (42 C.F.R. 410 § 71(d)), clinical social worker (42 C.F.R. 410 § 73(a)), nurse practitioner (42 C.F.R. 410 § 75(b)), and physician's assistant (42 C.F.R. 410 § 74(c)).   Medicare Part B <u>does not</u> include coverage for services provided by licensed professional counselors ("LPC") or interns.

24.     MACs pay for the above-referenced mental health services on the basis of a Physician's Fee Schedule ("PFS").    Services of a physician and a clinical psychologist are reimbursed at a rate set by the fee schedule.  Services provided by mid-level practitioners (NPs and PAs) are reimbursed at 85% of the participating fee schedule amount for the same service. *See* Medicare Claims Processing Manual, ch.23, Fee Schedule Administration and Coding Requirements, § 30.A.

25.     However, when NPs and PAs furnish services that are an incidental part of personal, professional services in the course of treatment of an injury or illness ordered by a physician and such services are furnished under the <u>direct supervision</u> of a physician, then the services qualify as an "incident to service." For billing and payment purposes, government healthcare programs treat "incident to services" as services furnished by the billing physician. Accordingly, when an NP or PA furnishes an "incident to service," the Government will reimburse the billing physician or their clinic one-hundred percent (100%) of the PFS amount (rather than 85%).  See 42 C.F.R. § 410.26(b)(5); see also Medicare Benefit Policy Manual ch.l5, §§ 60.1 & 60.2.

26.     "Direct supervision" in the office setting means that the physician must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the service or procedure.  42 C.F.R. § 410.32(b)(3)(ii).

27.     In addition to the explicit requirement of direct supervision, incident-to billing also requires that a Medicare-credentialed physician initiates the patient's course of care. An NP or PA cannot perform an initial patient evaluation and bill incident-to the physician's services. *See* Medicare Benefit Policy Manual ch.l5, § 60.2 (stating "*...there must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the nonphysician practitioner is an incidental part, and there must be subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of the course of treatment.*")

28.     Thus, if an NP or PA furnishes services that may otherwise be incident to an ordering physician's services, but there is no physician present in the office or immediately available to give assistance and direction, or the physician did not perform the initial patient evaluation, then the service *does not* qualify as an incident to service. In such a case, the mid-level provider must be identified as the rendering provider on the bill, and the mid-level provider must also sign the bill.  Under this scenario, the government would reimburse the clinic for the service rendered by the mid-level provider at 85% of the applicable rate published in the PFS.

29.     Services that physicians and mid-level providers render to beneficiaries of the government healthcare programs are billed to the government using Form CMS-1500.  In signing Form CMS-1500, the practitioner makes express certifications that he or she has complied with the regulatory requirements for billing for "incident to services," including but not limited to that "the services on this form were medically necessary and personally furnished by me or were

furnished incident to my professional service by my employee under my direct supervision." Form CMS-1500 also requires "the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service" and expressly provides that "[f]or services to be considered 'incident to' a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills."

## MEDICAID BILLING FOR MENTAL HEALTH SERVICES

30.     All Medicaid providers, including those enrolled in Traditional Medicaid and Medicaid MCOs, are required to comply with all requirements specific to Texas Medicaid. *See* Texas Medicaid Provider Procedures Manual, Medicaid Managed Care Handbook § 2.2 (2020).

31.     Under the Texas Medicaid program, "[a] physician may bill for reasonable and medically necessary services that are within the scope of practice of medicine or osteopathy as defined by state law." *See* 1 Tex. Admin. Code § 354.1062(b). "[E]ligible physician services include those performed by the physician and those medical acts delegated by the physician to qualified and properly trained persons acting under the physician's supervision." *See id.* Delegation and supervision of medical services must be consistent with the rules and laws of the Texas Medical Board, and supervision of the delegated medical act must be appropriately documented in the patient's chart. *See id.*

32.     A nurse practitioner or physician assistant may perform services for a patient under a physician's supervision and be reimbursed as if the supervising physician provided services, so long as the physician's involvement is documented in the patient's record of care, or

if the physician did not make a decision about the patient's care, the physician must note on the claim that the service was performed by the physician assistant or nurse practitioner. *See id*. at (d)(1).

33.     To qualify for reimbursement as a supervising physician in an outpatient setting, the supervising physician must document that he or she: (1) reviewed the patient's history and physical examination; (2) confirmed the patient's diagnosis; (3) determined the course of treatment to be followed; (4) assured that any needed supervision of interns or residents was provided; and (5) confirmed that the documentation in the medical records comports with the level of service billed. *Id.* at (a)(5).

34.     Professional services provided by an NP or PA are billed at the lesser of the billed charges or 92% of the reimbursement for the same professional services paid to a physician.  The claim for reimbursement for an NP or PA must either be (1) billed under the NP or PA's provider number or (2) under the physician's provider number, but note that on the date of service the physician did not make a decision about the patient's care.  *See* 1 Tex. Admin. Code § 355.8281(a) and §355.8093.

35.     Although Medicaid allows for delegation of signatory authority, "[a] provider delegating signatory authority to a member of office staff or to a billing service remains responsible for the accuracy of all information on a claim submitted for payment.  A provider's employees or a billing service and its employees are equally responsible for any false billings in which they participated or directed." Texas Medicaid Provider Procedures Manual, Section 1.6.8.1.

36.     Medicaid coverage for mental health services extends to providers not covered under the Medicare program, including Licensed Marriage and Family Therapists ("LMFT") and

LPCs. However, Medicaid does not permit LCSWs, LMFTs, or LPCs to bill Medicaid for services provided by people under their supervision; only the provider performing the service may bill Medicaid. *See* Texas Medicaid Provider Procedures Manual, Behavioral Health and Case Management Services Handbook, § 4.2.3, Delegated Services.

37.     Providers who submit claims to the Texas State Medicaid program must certify, among other things, the information on the claim form is true, accurate, and complete; that all services and supplies billed were medically necessary for the patient's diagnosis or treatment; and that the patient's health records document all services billed and the medical necessity of those services. *See* Texas Medicaid Provider Procedures Manual § 1.6.8 (2018).

38.     Providers who submit claims to Texas Medicaid MCOs are also responsible for certifying, among other things, that the information on the claim form is true, accurate, and complete; that all services and supplies billed were medically necessary for the patient's diagnosis or treatment; and that the patient's health records document all services billed and the medical necessity of those services. *Id.* at 2.2.

## FACTS

39.     TBH is a provider of mental health services in the South Texas area. Led by CEO Ul-Haq, TBH employs three medical doctors (psychiatrists): Dr. Fasiha Haq (related to Ul-Haq), Dr. Salah Qureshi, and Dr. Shekeel Raza. Additionally, TBH employs approximately twenty-three (23) NPs and PAs. Kathleen Lanini serves as TBH's only LCSW, and Merdith Roach is TBH's only LPC. TBH also employs a chemical dependency counseling intern.

40.     In July 2019, Relator interviewed with TBH for the role of Billing Manager. However, TBH hired Relator for the role of Program Therapy Manager.

41.     At the time of hire, TBH provided services to patients utilizing psychiatrists, NPs, PAs, an LPC, an LCSW, and a chemical dependency intern.  TBH desired to create a therapy program involving psychology services, and Relator was tasked with developing this program, as well as overseeing all other therapy programs. Relator joined TBH with twenty-eight (28) years of experience in healthcare, and eight (8) years of experience in mental health services.

42.     Relator worked primarily out of TBH's Pearland office, although she visited TBH's satellite offices on a weekly basis. Relator reported directly to and worked closely with Ul-Haq.

43.     Drs. Haq, Qureshi, and Raza are affiliated with several Houston-area hospitals and referred hospital inpatients to TBH's outpatient practice.  Patients are scheduled for appointments at TBH through TBH's scheduling office, which is located in Lahore, Pakistan. The Lahore office was responsible for verifying insurance coverage and placing patients on a provider's schedule.

44.     TBH utilizes a program called E-ClinicalWorks to schedule patient appointments. As Relator was responsible for TBH's therapy programs, Relator regularly logged into EClinicalWorks to view appointment schedules.  Within EClinicalWorks, Relator could view the patient's name, provider with whom the patient had an appointment, and the patient's insurance provider.

45.     TBH accepted traditional Medicare and a number of Medicare Advantage plans. Relator estimates that approximately 30% of TBH's patient population used a Medicare provider as their primary insurer.  TBH also accepted several Medicaid MCOs as primary insurance and Traditional Medicaid as secondary insurance.

46.     Aleem Abdul is the billing manager for TBH.  Relator frequently interacted with Abdul during the course of her employment and determined he had very poor knowledge of Medicare and Medicaid billing rules and regulations.  Upon her hire, Ul-Haq instructed Relator to "assist" Abdul.  Relator frequently provided Abdul with information concerning CMS guidelines.  Upon information and belief, Abdul had recently immigrated to the United States and is related to Dr. Qureshi.

47.     Shortly after beginning her employment with TBH, Ul-Haq organized a meeting between Relator and a contractor hired to assist with credentialing TBH's providers with various insurance companies.  During this meeting, the contractor advised Relator that he had not previously worked to credential any of TBH's providers with Medicare or Medicaid.

48.     At the time Relator was hired by TBH, Drs. Haq, Qureshi, and Raza were already enrolled with Medicare, Medicaid, and Medicaid MCOs.  Upon information and belief, Sheyla Randle (NP) and Jellrica Tan (NP) were the only mid-level providers at TBH who were credentialed to bill Medicare for services, but all NPs and PAs were scheduled to see Medicare and Medicaid patients.  Initially, Relator assumed that services provided to Medicare and Medicaid patients by non-credentialed mid-level providers were billed as "incident-to" services provided by one of the credentialed physicians.

49.     However, Relator soon learned that Drs. Qureshi, Haq, and Raza were rarely present in the outpatient office setting as they were kept busy with their inpatient practices.  In the few months that Relator was employed by TBH, she never saw Dr. Raza in an office setting, saw Dr. Qureshi just a handful of times, and was told by Ul-Haq that Dr. Haq would work in the office just one day per week.

50.     Despite the lack of physician presence, TBH scheduled approximately 250 new patient appointments per month and managed a census of approximately 7,000 patients per year. NPs and PAs each carried a full schedule of patients, and often rotated between the various locations to see patients.

51.     Relator observed that new patient and follow-up office visits for patients of Drs. Qureshi, Haq, and Raza were routinely conducted by TBH's NPs and PAs, without any direct physician supervision.

52.     Relator had the opportunity to refer a friend, an elderly woman and Medicare beneficiary, to TBH. Relator spoke with Dr. Qureshi regarding the referral, and Dr. Qureshi advised that an NP or PA would see the patient.  At this point, Relator realized that TBH's providers either did not understand or simply disregarded government rules and regulations concerning patient evaluations, physician supervision, and incident-to billing.

53.     As TBH's mid-level providers were not all credentialed with Medicare and Medicaid plans, claims could not be submitted under their name for the purposes of receiving the corresponding 85% or 92% reimbursement rates.  Relator concluded that the claims must have been submitted under the "supervising" provider's name in order to get the claim paid.  However, TBH's physicians did not provide a level of supervision sufficient for incident-to or Medicaid billing purposes, and Relator became concerned that TBH was engaging in improper billing practices.

54.     In one conversation, Relator verbally advised Dr. Qureshi, Ul-Haq, and Abdul that Medicare required, for the purposes of incident-to billing, that new patient evaluations be performed by a physician, and not an NP or PA.  Dr. Qureshi advised Abdul to "look into it." Relator interpreted this comment to mean Dr. Qureshi doubted Relator's concerns.

55.     Dr. Qureshi later informed Relator that he spoke to a friend, a fellow doctor, who advised Dr. Qureshi that he "just needed to be near his phone" during new patient appointments conducted by an NP or PA.

56.     Upon information and belief, Abdul and/or his subordinates submitted claims to Medicare and Medicaid that did not identify the rendering service provider (NP/PA) and instead claimed that the services performed by a credentialed physician in order to get the claim paid. However, the services provided by TBH's NPs and PAs were not done under the direct supervision of TBH's physicians, and the physician was not involved in determining the patient's course of care.

57.     In addition to improper incident-to billing, Relator learned that TBH had other suspect billing practices.  Specifically, TBH placed Medicare and Medicaid patients on the LPCs schedule, despite Medicare not covering LPC services, and also billed Medicare and Medicaid for services provided by the LPC and its chemical dependency intern.

58.     Merdith Roach worked as TBH's only LPC.  Upon information and belief, Roach had been employed at TBH for three to four years and saw approximately 8-10 patients per day.

59.     While reviewing provider schedules, Relator observed a Medicare patient on Roach's schedule.

60.     Relator advised Ul-Haq that Roach could not have Medicare patients on his schedule, and in response, Ul-Haq questioned: "why not?" Relator advised Ul-Haq that Medicare does not provide reimbursement for services provided by an LPC.  Ul-Haq admitted that Roach had seen this patient several times.

61.     Relator then questioned Abdul on how Roach's services were billed to Medicare. Relator stated, "This must be being billed under Dr. Qureshi then?" Abdul did not verbally

respond to Relator's accusation, and instead awkwardly and silently smiled at Relator. Relator interpreted Abdul's behavior to be confirmation of her suspicion.

62.     Relator also became concerned when she learned that the services of TBH's chemical dependency intern were being billed to Medicare and Medicaid.

63.     TBH's chemical dependency intern saw 6-8 patients per day. Although the intern was qualified only in counseling for chemical dependency, the intern provided counseling services outside the scope of her practice and to patients with a variety of mental health conditions.  Relator observed that patients with Medicare and Medicaid insurance coverage were placed on the intern's schedule.

64.     Roach advised Relator that TBH was billing for the intern's services "under him," and admitted that this made him uncomfortable.

65.     Upon learning that TBH billed for the intern's services, Relator advised Ul-Haq that TBH could not bill for her services on account of her status as an intern. Ul-Haq then questioned Relator and Abdul as to whether there was "any other way" TBH could bill for the intern's services.

66.     After Relator advised Ul-Haq that TBH could not bill for the intern's services, Roach thanked Relator for speaking up and confessed that the prior arrangement made him uncomfortable.  Roach stated, "how do you tell the big boss that he can't do that?"

67.     Medicare does not provide reimbursement for the services of an intern or an LPC, but Medicaid will cover the services of an LPC.  However, Medicaid does not provide reimbursement for services provided by a counseling intern.  Upon information and belief, TBH billed Medicare for the therapy services of its intern and/or Roach under another provider's

name, such as the LCSW.  Upon information and belief, TBH billed Medicaid for the services provided by the intern under Roach's name.

68.     United Psychiatry was credentialed with several insurance plans.   Upon information and belief, TBH submitted insurance claims through United Psychiatry instead of TBH if TBH lacked the credentials to bill a particular insurance plan.

69.     Although Relator was hired to manage TBH's therapy programs, it became clear to Relator that her attempts to bring TBH in line with government rules and regulations were not appreciated.  Ul-Haq complained that Relator sent him "too many emails" and became cold and short in his communications with Relator.

70.     On or about September 2019, Relator expressed another concern to Ul-Haq regarding statements made by Dr. Choi, a psychologist recently hired by TBH.  Although Dr. Choi was set to receive a significant salary from TBH, she stated that she intended to see just *one* patient per day.  Confused, Relator advised Ul-Haq that this arrangement did not make any financial sense and that TBH stood to lose money on this hire if Dr. Choi saw just one patient per day.  In response, Ul-Haq suggested that Relator resign if she could not agree with TBH's business decisions.

71.     Relator resigned from her employ in mid-September, 2019.

## COUNT I

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Presentation of False Claims to Medicare**

72.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

73.     Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States government, including those claims for payment for services that were not provided by the billing provider.

74.     Said claims were presented with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether they were false.

75.     By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act or an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000, adjusted for inflation, for each violation.

## <u>COUNT II</u>

**Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.001 *et seq*.
Presentment of Claims to Medicaid Using False Statements and/or
Misrepresentations of Material Facts**

76.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

77.     The TMFPA, in part, provides for liability for any person who knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.

78.     The TMFPA prohibits any person from making a claim under the Medicaid program while knowingly failing to indicate the type of license and the identification number of the licensed health care provider who actually provided the service.

79.     Defendants knowingly made or caused to be made false statements and/or misrepresentations of material fact in order to receive a benefit or payment under the Medicaid program.

80.     Said false statements and/or misrepresentations of fact were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

81.     By virtue of the false or fraudulent statements and/or misrepresentations made by Defendants, the State of Texas has suffered damages and therefore is entitled to recovery of an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00 for each violation.

## PRAYER FOR RELIEF

82.     As to Count I, Relator prays that judgment be entered against Defendants, ordering that:

    a.   The Defendants cease and desist from violating the False Claims Act;

    b.   The Defendants pay not less than $5,500.00 and not more than $11,000.00, adjusted for inflation, for each violation of 31 U.S.C. § 3729 et seq., plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

    c.   Relator be awarded the maximum Relator's share allowed pursuant to 31 U.S.C. § 3730(d);

    d.   Relator be awarded all costs of this action, including attorney's fees and costs pursuant to 31 U.S.C. 3730(d);

e.   Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the damages, penalties, fines, and costs awarded by the Court.

f.   The United States and Relator be awarded such other relief as the Court deems just and proper.

83. As to Count II, Relator prays that judgment be entered against Defendants, ordering that:

a.   The Defendants pay not less than $5,500.00 and not more than $11,000.00 for each violation of Tex. Hum. Res. Code §§ 36.001 et seq., plus three times the amount of damages the State of Texas has sustained because of the Defendants' misconduct;

b.   A fair and reasonable Relator's share allowed pursuant to Tex. Hum. Res. Code § 36.119 et seq.;

c.   Reimbursement of reasonable expenses which Relator incurred in connection with this action;

d.   Attorney's fees and costs;

e.   The State of Texas and Relator be awarded such other relief as the Court deems just and proper.

## JURY TRIAL

84.   Pursuant to Rule 38 of the Fed. R. Civ. P., Relator demands a trial by jury.

Respectfully submitted,

/s/ Steve Sumner_____
Steve Sumner
Texas Bar No. 19508500
E-Mail: ssumner@sumnerschick.com
Justin Sumner
Texas Bar No. 24063022
E-Mail: jsumner@sumnerschick.com

Sumner Schick, LLP
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
P: (214) 965-9229
F: (214) 965-9215
ATTORNEYS FOR RELATOR